IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 25-cv-01741-NYW

SUSANNA DVORTSIN, as Next Friend of Hayam El Gamal et al.,

    Petitioner,

v.

KRISTI NOEM, Secretary of U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"), TODD LYONS, Acting Director of Immigration and Customs Enforcement ("ICE"), and ROBERT GUADIAN, ICE, Denver Field Office Director,[1]

    Respondents.

## ORDER

Before the Court is Petitioner's Ex Parte Application for Temporary Restraining Order and Order to Show Cause (D. 2).[2] Petitioner filed her brief in support (D. 13) and Respondents have filed their response (D. 15).

Petitioner Susanna Dvortsin submitted a Verified Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief (Petition) (D. 1) as next friend of Hayam El Gamal (Ms. El Gamal) and her five children.[3] The Court will provide a review of the facts and procedure

---

[1] Respondents indicate that originally named defendant John Fabbricatore no longer serves in this position and should be substituted pursuant to Fed. R. Civ. P. 25(d) (D. 15 at 1 n.1).

[2] This TRO is being handled on an emergency basis by the Undersigned due to its urgency and an ongoing jury trial resulting in the unavailability of U.S. District Judge Nina Y. Wang.

[3] Ms. Dvortsin is Ms. El Gamal's attorney (*see* D. 1 at 3).

1

that lead to this point and then a limited recitation of those facts necessary to resolving the present jurisdictional issues.

## I. ALLEGATIONS, PROCEDURE, AND ISSUANCE OF THE TRO

### A. Initial Allegations

Ms. El Gamal is the spouse of Mohamed Soliman, a man accused of and charged with a horrific June 1, 2025 antisemitic fire-bombing attack "against a peaceful gathering of individuals commemorating Israeli hostages" (D. 1 at 2). This Court is aware that Mr. Soliman was taken into custody on June 1, 2025, at the scene of the attack. At some point on June 3, 2025, immigration authorities detained Ms. El Gamal and her children. On June 4, 2025, at 12:45 a.m. Mountain Daylight Time (MDT), Petitioner lodged the Petition (D. 1). Prior to filing the Petition, Petitioner had last heard from Ms. El Gamal on June 3, 2025, at 11:45 a.m. MDT, when Ms. El Gamal reported to Petitioner that she and her children were in Immigrations and Customs Enforcement (ICE) custody in Florence, Colorado (*id.* at 2).

On June 3, 2025, at 2:12 p.m. MDT, the official Twitter/X account for the White House posted an update on the family's detention:



Then, at 2:42 p.m. MDT, the official Twitter/X account for the White House posted a further update:



(D. 1 at 3 (citing posts[4])). *See* Fed. R. Evid. 201(b)(2) (permitting courts to take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

The Petition alleges that "Ms. El Gamal and her five children—E.S., A.S., H.S., O.S., H.S.—entered the United States with B-1 visitor visas in 2022, have resided continuously in the United States for more than two years, and are therefore not subject to expedited removal. 8 U.S.C. § 1225(b)(1)(A)(iii)(II)" (D. 1 at 3). And the Petition, which attaches a copy of the relevant visa application (D. 2-3 at 2), goes on to state that "Ms. El Gamal is a network engineer with a pending EB-2 visa, available to professionals with advanced degrees. Mr. Soliman filed an asylum application, and Ms. El Gamal and all five children are dependents on that application. The application is still pending" (D. 1 at 4).

### B. Procedural Due Process in Immigration Detention Matters

Procedural due process in enshrined in the Fifth and Fourteenth Amendments to the United States Constitution. It requires the Government to follow fair procedures before depriving any person of life, liberty, or property. *See Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (per curiam) ("'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993))). At bottom, those procedures include some sort of notice, an opportunity to be heard, and a decision by a neutral party. *Id*. Much like the carpentry metaphor of measuring twice and cutting once, the

---

[4] The posts are available at https://x.com/WhiteHouse/status/1929994561398681868 and https://x.com/WhiteHouse/status/1930002225860133080.

purpose of procedural due process is to ensure that courts and other decisionmakers, in a deliberative fashion, reach the correct answers without making unnecessary mistakes.

Recently, in *Espinoza v. Ceja*, 25-cv-01120-GPG (D. Colo. May 5, 2025), ECF No. 11, this Court weighed in on what it interprets due process to require in the immigration-detention context. So that due process is not denied, an immigration detainee must—*at a minimum*—be "afforded the statutory processes provided in immigration law."[5] *Id.* at 17. In short, while the Government may make rules in the immigration-detention context that it could not constitutionally apply to United States citizens, and while the Government need not treat all noncitizens alike, due process nevertheless requires the Government to comply with its own laws (*id.* at 11).

### C. Analysis Resulting in the Initial TRO

A court presented with an *ex parte* emergency request for a temporary restraining order (TRO) pursuant to Federal Rule of Procedure 65 is authorized to issue a TRO to avoid "immediate and irreparable injury." Fed. R. Civ. P. 65(b)(1)(A). The basic purpose of a TRO is to "preserv[e] the status quo and prevent[] irreparable harm" before a preliminary injunction hearing may be held. *Granny Goose Foods, Inc. v. Bd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974). TROs are—by definition—temporary: a TRO issued on an *ex parte* basis lasts no more than 14 days (unless the issuing court extends it "for good cause . . . for a like period or the adverse party consents to a longer extension"). *See* Fed. R. Civ. P. 65(b)(2). Moreover, when a court issues an *ex parte* TRO, the adverse party may appear on two

---

[5] The habeas petitioner who brought that case—though he was detained within the United States—was for purposes of United States immigration law treated as if he were detained at the border and as not having effected entry into the United States. But even that petitioner was entitled to the process specified in the United States' applicable immigration statutes.

days' notice—or on shorter notice set by the court—and move to dissolve or modify the TRO.[6] *See* Fed. R. Civ. P. 65(b)(4).

Petitioner presented evidence that Ms. El Gamal and her children have resided in the United States for over two years. For that reason alone, it would seem that Respondents could not legally place them in *expedited* removal proceedings. *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(II) (conditioning the Attorney General's ability to apply expedited removal procedures to non-arriving noncitizens on those noncitizens' having been present in the United States for under two years); *see also* 8 C.F.R. § 235.3(b)(1)(2) (providing that expedited removal proceedings may only be applied to "arriving aliens" and "as specifically designated by the Commissioner, aliens who have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the two-year period immediately prior to the date of determination of inadmissibility"). Yet the Government expressly stated that this was what it was doing—per the White House, ICE "captured" Ms. El Gamal and her children and was detaining them "for expedited removal" as early as the night of June 3, 2025.[7]

---

[6] Respondents have not asserted such a request here.

[7] The Government now concedes that "[b]ased on the information currently available to ICE, Ms. El Gamal and children are not eligible for 'expedited' removal proceedings under 8 U.S.C. § 1225(b)" (D. 15-1 at ¶ 18). The Government further states that Ms. El Gamal and her family have been placed in conventional—as opposed to expedited—removal proceedings and suggests that this was the plan all along. But the Government's brief entirely ignores the White House's pronouncements to the contrary, and it was these pronouncements that justified issuing the TRO in the first instance. The Government brief does not disavow the White House's earlier pronouncements that it intends to attempt expedited removal or remove Ms. El Gamal and her children immediately despite apparently recognizing that such processes would not comport with due process. While, as discussed *infra*, the propriety of continued injunctive relief is ultimately an issue for another court, the lack of clarity (and seeming conflict in position among Government actors as to the plan for removing Ms. El Gamal and her family) militates in favor of keeping the existing TRO in place for now.

To protect the status quo (and to afford Ms. El Gamal and her children an opportunity to challenge the apparent illegality of the Government's stated efforts to remove them on an expedited basis, as opposed through conventional removal proceedings before an immigration judge, at which they could presumably assert defenses to removal), the Court entered a TRO enjoining Respondents from removing Ms. El Gamal and her children from the United States or transferring them out of Colorado.[8] That was all the TRO did—the Court did not rule on the other relief Petitioner asked the Court for, including "preliminary relief permitting counsel access to Ms. El Gamal and ordering release of Ms. El Gamal" (*see* D. 1 at 7). Ms. El Gamal and her children—so far as the Court is aware—remain secure in ICE custody.

As discussed above, Petitioner presented sufficient evidence to show Respondents may not—consistent with the requirements of the applicable immigration statutes—place Ms. El Gamal and her children in expedited removal proceedings. If Respondents had resorted to expedited removal and summarily deported Ms. El Gamal and her children to Egypt (as the Government expressly threatened to do), Respondents likely would have violated Ms. El Gamal's and her children's due process rights. But the Government is constitutionally obligated to provide due process. It therefore was and remains necessary to halt immediate deportation until the situation is figured out—to measure twice and cut once. *See A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1368 (2025) (granting TRO to prevent expedited deportation potentially violative of due process).

---

[8] As discussed below, the remain-in-Colorado component of the TRO was moot as ICE had already relocated the family to Texas by the time Petitioner lodged the Petition.

## II. JURISDICTIONAL FACTS

Additional facts have since been added to the record through Petitioner's brief in support of her TRO request (D. 13). On the evening of June 3, 2025, "a group of four or five officers picked the family up from the Florence facility and drove them to the airport in Denver, roughly two hours away" (*id.* at 9). On the way, "they stopped at a DHS office in Denver to pick up another two officers" (*id.*). Ms. El Gamal and her children were flown to San Antonio, Texas, that evening, arriving shortly before midnight (*id.*). In Texas, the group from Colorado was joined by local ICE officers who drove almost everyone[9] to ICE's Dilley Detention Center (Dilley) (*id.* at 10). After being driven approximately 90 miles, "the family arrived at Dilley between 2:00 and 2:30 a.m. Central Time" (*id.*).

The Petition was filed at 12:45 a.m. MDT, local time in Colorado on June 4, 2025, which corresponds to 1:45 a.m. Central Time. Thus, at the time the Petition was filed, the family had already departed this District and arrived within the Western District of Texas.

## III. HABEAS JURISDICTION

**A. Background**

The various federal courts are empowered to issue writs of habeas corpus by 28 U.S.C. § 2241(a). That statute provides in relevant part that "[w]rits of habeas corpus may be granted by . . . the district courts within their respective jurisdictions" when a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241. Under the district of confinement rule, which is "the general rule that for core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement."

---

[9] Respondents assert that one Colorado ICE officer did not travel to Dilley (D. 15 at 5).

*Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004).  And what matters is the location of the habeas applicant at the time of filing: "It is well established that jurisdiction attaches on the initial filing for habeas corpus relief, and it is not destroyed by a transfer of the petitioner and the accompanying custodial change."  *Santillanes v. U.S. Parole Comm'n*, 754 F.2d 887, 888 (10th Cir. 1985) (citations omitted).

### B. Analysis

Here, Ms. El Gamal and her children were indisputably in ICE custody in the Western District of Texas when Petitioner lodged the Petition.  The Western District of Texas is the relevant district of confinement.  And it does not matter for this analysis that Ms. El Gamal and her children were in transit, and had not been booked into Dilley, at the moment the Petition was filed.  *See, e.g.*, *Ozturk v. Trump*, No. 25-CV-10695-DJC, 2025 WL 1009445, at *2, *10 (D. Mass. Apr. 4, 2025) (concluding that the District of Vermont was the relevant district of confinement where the petitioner, who had been arrested in Massachusetts, was in transit through that District at the moment her counsel filed a habeas petition).

Nevertheless, Petitioner argues that this Court retains jurisdiction to hear the Petition.  First, she asserts that the Denver ICE Field Office was the custodian of the family at the time the petition was filed (D. 13 at 15–17).  She cites several cases that relate to the "immediate custodian rule," which holds that "the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official."  *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (citations omitted).  Under this rule, if "a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement."  *Id*. at 447 (same).  What Petitioner

10

seems to be saying is that, where the immediate custodian's location and the locus of detention differ, the immediate custodian's location drives the jurisdictional analysis. But that proposed rule is difficult to square with *Padilla*, which observed that "[b]y definition, the immediate custodian and the prisoner reside in the same district." *Id.* at 444. And the immediate custodian rule really goes to another part of the jurisdictional analysis—"whatever the analytical overlap between" the district of confinement rule "and the immediate-custodian rule may be, the Court must address both rules in determining its jurisdiction." *Ozturk*, 2025 WL 1009445, at *10. Further, the "district of confinement" rule takes precedence over the "immediate custodian" rule because jurisdictional issues related to the immediate custodian are practically resolved by the court jurisdiction over supervising officials. *Khalil v. Joyce*, No. 25-CV-01963-MEF-MAH, 2025 WL 972959, at *25–27 (D.N.J. Apr. 1, 2025) (*Khalil II*), *motion to certify appeal granted*, 2025 WL 1019658 (D.N.J. Apr. 4, 2025).

Second, Petitioner argues that "this is the rare case in which exceptions discussed by Justice Kennedy's concurrence and acknowledged by the majority in *Padilla* excuse non-conformance with the immediate custodian and district of confinement rules in habeas cases" (D. 13 at 17). In particular, she notes that Kennedy's concurrence "would acknowledge an exception if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention." *Padilla*, 542 U.S. at 454.

Even assuming that Justice Kennedy's *Padilla* concurrence is the law, this argument is unpersuasive. As Petitioner acknowledges, Ms. El Gamal was able to contact Petitioner to explain

11

that the family was detained at ICE's facility in Florence based on correct information provided by ICE.[10] Thus, at that point, the Government was forthcoming about the "identity of the custodian and place of detention." Petitioner does not indicate the Government concealed the family's location in Texas or custodian there. There is no indication that the Government's purpose in relocating Ms. El Gamal and her children to Texas was concealment. And the Government contends that its motivation for the transfer was innocent: it suggests that the Dilley facility (in contrast to ICE's Colorado facilities) is designed to house families.

While there is some factual dispute as to the extent of the access counsel has had to Ms. El Gamal, both before and after her arrival in Texas, the level of factual detail in Petitioner's brief (D. 13 at 7–10) would indicate counsel and Ms. El Gamal likely had multiple telephone calls or a lengthy telephone call since arrival at the Texas facility. Additionally, this Court has been presented with no evidence to indicate that some sort of shell-game is occurring with the current place of confinement. Ms. El Gamal and children were moved once, to Texas, and, as far this Court knows, there they remain. Thus, Petitioner's proposed exception based on Justice Kennedy's *Padilla* concurrence does not apply to stretch the Court's jurisdiction beyond its traditional bounds. *Padilla*, 542 U.S. at 454 (Kennedy, J., concurring) ("None of the exceptions apply here. There is no indication that the Government refused to tell Padilla's lawyer where he

---

[10] Based on this information and the urgent nature of this case in view of the White House's claims that immigration authorities were pursuing expedited removal, filing promptly in Colorado was the only avenue open to Petitioner and is no indication of forum shopping. This Court in no way faults Petitioner for the choice to initially file in Colorado—in fact, it was likely the only logical choice based on the information Petitioner knew at the time she filed. Petitioner filed in the District in which she believed Ms. El Gamal and her children were either located or last located during a time when she was unable to verify this information and there appeared, at least to Petitioner, a need to urgently lodge the Petition. These facts, along with the importance of the issues raised, supports transfer instead of dismissal.

had been taken. The original petition demonstrates that the lawyer knew where Padilla was being held at that time.").

Finally, Petitioner argues that the Court retains jurisdiction under the "unknown custodian" exception (D. 13 at 19–20). *See Padilla*, 542 U.S. at 450 n.18. Even assuming that rule applied, it might excuse Petitioner from naming the immediate custodian of Ms. El Gamal and her children as a respondent in the Petition. But the Court is skeptical that it could be used to subvert the district of confinement rule here. *See Khalil II*, 2025 WL 1019658, at *32–36 (applying the unknown custodian exception *in support* of finding jurisdiction in the district of confinement); *Ozturk*, 2025 WL 1009445, at *10 (construing the unknown custodian exception as an exception to the immediate custodian rule, but nevertheless transferring the action to the District of Vermont because the petitioner was detained in the District of Vermont at the time of filing).

While the Court finds that Petitioner's core habeas claims clearly need to be asserted in Texas, that proposition is less clear for Petitioner's non-core habeas claims—that is, Petitioner's requests for relief *not* bearing on the family's ongoing confinement, such as Petitioner's request for a stay of removal (D. 1 at 6–7).[11] As it relates to these claims, this is a borderline case where

---

[11] *Padilla* describes core habeas claims as those arising from "petitions challenging present physical confinement." *Id.* at 443. Non-core claims would therefore challenge something beyond physical confinement. In this instance, the non-core claims would include those contending that Respondents must apply the applicable immigration procedures (as opposed to inapplicable ones) and that the family's removal from the United States should be temporarily stayed. This Court makes no determination based on the relative importance to the parties of either type of claim (in the asylum context, particularly if there is a credible fear of return to a country of origin, removal may be more immediately concerning than release). The distinction is, however, crucial to the jurisdictional analysis. Core claims are most appropriately driven by the "simple test" from *Padilla*—they must be handled in the physical jurisdiction where the habeas claimant was located at the time Petition was lodged (Texas in this instance). And, ultimately, the immediate custodian should be named—although that is subject to amendment once the proper custodian is known and identified. Non-core claims differ; there appears to be more support for the proposition that the physical location of the claimant may not ultimately be the driving factor. Like in *Khalil v. Joyce*, No. 25-CV-1935-JMF, 2025 WL 849803 (S.D.N.Y. Mar. 19, 2025) (*Khalil I*), this Court finds it most appropriate to transfer the non-core claims under a *forum non conveniens* theory to the court that has jurisdiction over the core claims, TRO intact for the time being.

binding authority does not compel any decision. *See Padilla*, 542 U.S. at 453 (Kennedy, J., concurring) ("It is difficult to describe the precise nature of these restrictions on the filing of habeas petitions, as an examination of the Court's own opinions in this area makes clear."). Although precedent indicates that the Court has jurisdiction over such claims, they are founded on the same principles and facts as the core habeas claims seeking release confinement (*id*. at 4–8).

The Court concludes that the proper court to adjudicate these disputes is the U.S. District Court for the Western District of Texas (*see* D. 13 at 21 (requesting transfer in the alternative)). The Court finds that transfer to the U.S. District Court for the Western District of Texas serves the interests of justice. *See* 28 U.S.C. §§ 1404(a), 1406, 1631. Further, because Petitioner's core habeas claims are closely related to her non-core claims, the Court also finds that the convenience of parties and witnesses favors transferring the entire action to a proper jurisdiction for all claims. *See* 28 U.S.C. § 1404(a); *Khalil I*, 2025 WL 849803, at *13 (transferring core habeas claims under Section 1406(a) and non-core claims under Section 1404(a)); *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1519 (10th Cir. 1991) (discussing severance before transfer).[12]

---

As to the proper respondent in non-core deportation proceedings, at least one Court in this District has determined it proper to allow such claims to proceed against the Attorney General and DHS Secretary on the understanding that a particular warden, the immediate custodian, has little if anything to do with deportation. *Sanches-Penunuri v. Longshore*, 7 F.Supp.3d 1136, 1151 (D. Colo. 2013). This Court finds that it is most appropriate for the transferee Court to delve into proper party determinations.

[12] Respondents assert several arguments for dismissal independent of Petitioner's apparent failure to file the Petition in the district of confinement. For instance, Respondents contend that the Petition does not name the proper parties, and that Petitioner has not established that she should be permitted to proceed as the next friend for Ms. El Gamal and her children. Because the Court is transferring this action, these arguments are for the U.S. District Court for the Western District of Texas to resolve.

In transferring the case, the Court does not disturb any of the pending orders, including the Temporary Restraining Order (D. 5) previously entered.[13] *See Chrysler Credit Corp.*, 928 F.2d at 1519 (explaining that prior orders and judgments remain in effect upon transfer). It will be up to our sister court to consider whether continued injunctive relief is warranted beyond its present 14-day limit, as well as the merits of the claims Petitioner raised in her Petition. *See* Fed. R. Civ. P. 65(b)(2).

## IV.  CONCLUSION

Accordingly, it is ORDERED that this case is transferred to the U.S. District Court for the Western District of Texas, with the TRO intact, until further Order of the transferee Court or the expiration of the 14-day limit of the TRO. The Clerk of the Court SHALL effectuate such transfer and thereafter close this case.

DATED June 12, 2025

BY THE COURT:

Gordon P. Gallagher
United States District Judge

---

[13] While the Court's original TRO required that Ms. El Gamal and her children remain in Colorado, that portion of the Order was unknowingly moot before it was even entered as they were already in Texas. The Government can and should read the Order to require maintenance of the family in Texas until this issue is further addressed by the transferee court.